1

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3
- - - - - - - - - - - - - X        23-CR-0099
4    UNITED STATES OF AMERICA,
                    Plaintiff
5
           Vs.                          Buffalo, New York
6    SIMON GOGOLACK,                    September 14, 2023
                    Defendant
7    - - - - - - - - - - - - - X

8
                    TRANSCRIPT OF DETENTION HEARING
9          BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
                    UNITED STATES MAGISTRATE JUDGE
10

11          U.S. ATTORNEY'S OFFICE - BUFFALO
           BY: NICHOLAS COOPER, ESQ.
12          138 Delaware Avenue
           Buffalo, New York 14202
13          Appearing on behalf of the Plaintiff

14          FEDERAL PUBLIC DEFENDER
           BY: JEFFREY T. BAGLEY, ESQ.
15          300 Pearl Street
           Suite 200
16          Buffalo, New York 14202
           Appearing on behalf of the Defendant

17

18

19

20

21
     COURT REPORTER:Brandi A. Wilkins
22                  scalisba@gmail.com
                    Kenneth B. Keating Federal Building
23                  100 State Street, Room 2120
                    Rochester, New York 14614
24

25

2

1              THE COURT:  Morning.  Please be seated.

2              THE CLERK:  We're on the record in criminal

3       proceeding 23-CR-99 United States of America versus

4       Simon Gogolack for a detention hearing and

5       arraignment.  Present in the courtroom are Assistant

6       U.S. Attorneys Nicholas Cooper and Joseph Tripi.

7       Defendant Mr. Gogolack with Assistant Federal Public

8       Defender Jeffrey Bagley and United States Probation

9       Officer Andre McCray.  The Honorable Jeremiah J.

10      McCarthy presiding.

11             THE COURT:  Good morning, Mr. Gogolack.

12      Good morning, Counsel.

13             MR. COOPER:  Morning Judge.

14             MR. BAGLEY:  Morning Judge.

15             THE COURT:  All right.  Before we proceed to

16      the detention hearing, there has been an indictment

17      returned which is dated September 13, 2023.  Mr.

18      Gogolack, have you received a copy of the indictment?

19             THE DEFENDANT:  I just did, yes.

20             THE COURT:  Is there motion to unseal?

21             MR. COOPER:  Your Honor, at this time, the

22      Government is moving to unseal the indictment.

23             THE COURT:  Okay.  That motion is granted.

24      Um, Mr. Cooper, do you want to briefly summarize the

25      charges and the potential penalties?  It seems to me

1    they're -- I didn't compare word for word, but they

2    seem to be the same charges as alleged in the

3    complaint.  Is that correct?

4            MR. COOPER:  That's largely correct, Your

5    Honor.  Um, any changes may be to date ranges charged

6    with respect to count one, but the substantive charges

7    are the same.  I'll summarize the indictment.  It's a

8    five count indictment and that it includes one

9    forfeiture allegation.

10           Count one charges the defendant with

11   narcotics conspiracy beginning on or about July 2,

12   2023, and continuing until on or about August 8, 2023.

13   Specifically that the defendant conspired to commit

14   the following offense, that is to possess with intent

15   to distribute and to distribute fentanyl, cocaine,

16   methamphetamine, marijuana and Xanax.  That narcotics

17   conspiracy carries a maximum penalty of 20 years

18   imprisonment.  There's no mandatory minimum associated

19   with that offense.

20           Count two charges the defendant with

21   maintaining a drug involved premises in violation of

22   Title 21 United States Code Section 856(a)(1).  The

23   timeframe is again July 2 through August 8, 2023.  The

24   premises is 296 Scott Avenue, Wellsville, New York.

25   And there is no mandatory minimum associated with that

1    offense.  The maximum penalty is 20 years of

2    imprisonment.

3         Count three charges the defendant with

4    possession of firearms in furtherance of drug

5    trafficking.  The date range is the same as the two

6    aforementioned counts.  That's in violation of Title

7    18 United States Code Section 924(c)(1)(a)(1).

8    There's a five year mandatory minimum penalty

9    associated with that offense which is required by

10   operation of law to run consecutively to any other

11   penalty associated with this offense, and there's a

12   maximum possible sentence of life imprisonment with

13   respect to that count.

14        Count four charges the defendant with being

15   a felon in possession of a firearm and ammunition.

16   The date range for count four is July 21 through

17   August 8, 2023.  And um, it alleges that the defendant

18   possessed a specific firearm and ammunition in

19   violation of Title 18 United States Code Sections

20   922(g)(1) and 924(a)(8).  That offense carries no

21   mandatory minimum and a maximum penalty of 15 years

22   imprisonment.

23        Count five charges the defendant with being

24   an unlawful user of controlled substances in

25   possession of a firearm and ammunition.  The date

1    range is the same as that in count four.  That's in

2    violation of Title 18 United States Code Section

3    922(g)(3) and section 924(a)(8), and that also has no

4    mandatory minimum and carries a maximum possible

5    penalty of 15 years imprisonment.

6              THE COURT:  Okay.  Sir, you have the right

7    to remain silent.  Anything that you say may be used

8    against you.  Um, however, you cannot be compelled to

9    testify against yourself.  You are legally presumed

10   innocent of these charges at the present time.  Um,

11   you have the right to be represented by an attorney,

12   and if you cannot afford an attorney, one will be

13   appointed for you.  Now, you recently were charged in

14   a criminal complaint and counsel, um, was appointed

15   for you.  Are you asking that Mr. Bagley be

16   reappointed?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you accept the reappointment,

19   Mr. Bagley?

20             MR. BAGLEY:  Yes, Judge.  Thank you.

21             THE COURT:  Okay.  Do you waive the formal

22   reading of the indictment?

23             MR. BAGLEY:  We do.

24             THE COURT:  And how does the defendant

25   plead?

```
 1            MR. BAGLEY:  Not guilty, Judge.

 2            THE COURT:  Okay.  Counsel, at the complaint

 3     stage, I also issued a -- orally and in writing a

 4     Brady order to the Government.  Does anybody wish me

 5     to repeat that or will it be deemed continuing in

 6     effect?

 7            MR. COOPER:  Judge, I acknowledge the

 8     Court's order and I understand it to be continuing in

 9     effect.

10            THE COURT:  Mr. Bagley, do you agree?

11            MR. BAGLEY:  Yes.

12            THE COURT:  Okay.  All right.  Um, then --

13     well, do we want to do the -- the detention hearing

14     now or do we want to talk about a scheduling order

15     first?  I leave it up to counsel.

16            MR. COOPER:  I'm ready to go with the

17     detention hearing unless Mr. Bagley has a different

18     position.

19            MR. BAGLEY:  Yeah, Judge.  I think detention

20     hearing first would make sense.

21            THE COURT:  Okay.  Counsel, you both

22     received the pre-trial services report dated August

23     30; is that correct?

24            MR. BAGLEY:  Yes.

25            MR. COOPER:  That's correct, Judge.
```

1          THE COURT:  Okay.  Mr. Cooper?

2          MR. COOPER:  Your Honor, the United States

3     is asking that you detain the defendant in this case,

4     and I'm going to go through -- I have a power point

5     presentation and I'm going to ask you first if you are

6     able to see that on the screen in front of you.

7          THE COURT:  Yes.

8          MR. COOPER:  Okay.  So the basis that the

9     Government is moving for detention, Judge, are under

10    18 United States --

11         THE COURT:  Well, before you mentioned --

12    you mentioned your power point and I know at prior

13    stages there was -- you had indicated that you had

14    some information that you had shared -- attempted to

15    share with prior counsel.  He was not able to access

16    it for whatever reason, but I assume that Mr. Bagley

17    has had access to whatever you are going to be talking

18    about.  Is that correct?

19         MR. COOPER:  That's my understanding, but

20    you can ask Mr. Bagley to confirm it.

21         MR. BAGLEY:  Judge, I don't know what's in

22    the fancy power point, but I did get um --

23         THE COURT:  He didn't say it was fancy.

24         MR. BAGLEY:  It looks pretty -- it's already

25    looking fancy to me, Judge.

```
 1              THE COURT:  Okay.  Well --
 2              MR. BAGLEY:  He's got the case heading and
 3    everything, Judge.  Um, but I did get discovery from
 4    -- from the Government, Judge, um, pictures, videos,
 5    you know, things like that.  So if that's what's in
 6    this um power point, Judge, then I did receive that
 7    information.
 8              THE COURT:  Okay.
 9              MR. COOPER:  Okay, great.  All kidding
10    aside, Judge, this case is in my view as serious as it
11    gets.  Um, the indictment in this instance is the tip
12    of the iceberg, and we'll get into that in a little
13    bit more detail later.  I always start with the basis
14    for detention.  Here it's 18 United States Code
15    Section 3142(f)(1)(a).  922)g) is a crime of violence,
16    924(c) is a crime of violence, and that allows the
17    basis for detention.
18              18 United States Code Section 3142(f)(1)(b)
19    because the defendant is charged now by indictment
20    with a 924(c) offense with a maximum of life
21    imprisonment that's a basis for detention.  Under 18
22    United States code 3142(f)(1)(c) because the defendant
23    is charged under the controlled substance act with a
24    penalty that has a statutory maximum over ten years
25    that's a basis for you to detain him.
```

1          Under 18 United States Code Section
2     3142(f)(1)(e), any felony that's not otherwise a crime
3     of violence that involves the possession or use of a
4     firearm or destructive device or any other dangerous
5     weapon, that's another for you to detain the
6     defendant.  Under 18 United States Code 3142(f)(2)(a)
7     because there's a serious risk in this case that the
8     defendant will flee, and I'll discuss that in more
9     detail in a bit, but that's a basis for you to detain
10    this defendant.

11         And under Title 18 United States Code
12    Section 3142(f)(2)(b), a serious risk that this
13    defendant will obstruct or attempt to obstruct justice
14    or threaten, injure or intimidate or attempt to
15    threaten, injure or intimidate a perspective witness
16    or juror, and we're going to get into that in a little
17    more detail, but that's a basis for you to detain the
18    defendant.

19         On top of having numerous basis to detain
20    the defendant, there's two applicable statutory
21    presumptions that say this Court should presume the
22    defendant should be detained under Title 18 United
23    States Code Section 3142(e)(3)(a) because of that
24    Title 21 offense with the statutory maximum of at
25    least ten years and under 3142(e)(3)(b) there's a

1   presumption the defendant should be detained because

2   of the 924(c) offense.

3           THE COURT:  Okay.  And um, apologies in

4   advance.  Are there any mandatory minimums on any of

5   these charges?

6           MR. COOPER:  So Judge, as we discussed with

7   the -- during the arraignment, the 924(c) offense

8   carries a five year mandatory minimum penalty --

9           THE COURT:  Okay.

10          MR. COOPER:  -- that has to run consecutive

11  to any other sentence.

12          THE COURT:  Okay.

13          MR. COOPER:  Other than that, the current

14  narcotics offense that's charged in this indictment

15  does not carry a mandatory minimum.

16          THE COURT:  Okay.

17          MR. COOPER:  So we've summarized the charges

18  already.  I'm going to skip through these.  We've gone

19  through the detention basis.  Gone through the

20  presumptions.  The factors under 3142(g).  The first

21  factor for the Court to consider is the nature and

22  circumstances of the offense.  Here we have the

23  possession of a loaded shotgun in furtherance of drug

24  trafficking which is an inherently dangerous and

25  violent crime.  In the incident case, the defendant's

1    cell phone is chock-full of text messages and

2    photographs that make it clear that he's a drug

3    trafficker.  The defendant's cell phone also makes

4    clear that he has access to numerous firearms.

5           During the search warrant at the defendant's

6    residence, law enforcement recovered a tactical

7    shotgun and they recovered body armor, and no matter

8    how hard the defendant tries today to distance himself

9    from that shotgun or from that body armor he cannot

10   because the text messages and photographs in his phone

11   make it abundantly clear that the shotgun belonged to

12   him and the body armor belonged to him.

13          The weight of the evidence against the

14   person.  This is a factor that probation doesn't

15   consider when making their recommendation, and I point

16   out that even though they didn't consider that,

17   probation still recommended that you detain this

18   defendant.  The weight of the evidence here is

19   considerably strong.

20          The search warrant for the defendant's cell

21   phone establishes I would submit beyond any doubt that

22   the defendant is involved in a narcotics conspiracy.

23   The contents of the defendant's phone establish that

24   he's a drug dealer and that he possessed numerous

25   firearms and body armor in furtherance of that drug

1    trafficking activity.

2           A search warrant at the defendant's

3    residence yielded recovery of a tactical shotgun,

4    ammunition, body armor, drug paraphernalia and

5    suspected drugs or cutting agent for drugs, and that's

6    consistent with what you will see and hear from his

7    cell phone.  Here are just a couple of the photographs

8    recovered from the defendant's cell phone, and in

9    order to keep this power point under 500 slides, we

10   had to make some selections.  This is a photograph of

11   what appears to be drugs --

12           THE COURT:  Again, I'm assuming unless you

13   tell me differently that all of these have been shared

14   with Mr. Bagley; correct?

15           MR. COOPER:  So Judge, all of this and more

16   has been shared with Mr. Bagley, first of all.  This

17   morning I emailed Jeff two new pictures because they

18   weren't in that initial disclosure because I intended

19   on relying on them today.

20           THE COURT:  Okay.

21           MR. COOPER:  And I would just like to point

22   out that's above and beyond what the law requires

23   which is that I not be required to turn over

24   discoverable material before a detention hearing, but

25   we've gone above and beyond to do that here.

1           THE COURT:  Okay.

2           MR. COOPER:  These are photographs of what

3    obviously appears to be drugs taken from the

4    defendant's phone.  This next photograph I would

5    submit to a jury and to the Court right now that this

6    is 924(c) in a single photograph.  Here we have

7    hypodermic needles, a semi automatic firearm with a

8    laser on it, which the defendant text messages with

9    various people about trying to sell, another firearm

10   above that semi automatic pistol, it's unclear to me

11   what that is, ammunition in a tupperware, alcohol,

12   pill bottles and what appears to be tied off plastic

13   bags of drugs.

14           There's not a better picture on earth to

15   demonstrate possession of a fire arm in furtherance of

16   drug trafficking than this picture in front of Your

17   Honor.  This is pulled from the defendant's phone and

18   the photo, Judge, it's not from May.  It's not from

19   last year.  It's from July 21, 2023.  And the metadata

20   from the extraction is underneath that photograph.

21           This next photograph, the defendant

22   possessing a semi automatic firearm.  This is seized

23   from his phone.  Again, the photo was created on July

24   21, 2023.  The next slide the defendant taking

25   photographs of more pistols again July 21, 2023.  And

1    we'll get into the text messages in a little bit where

2    the defendant is trying to sell these firearms,

3    offering to sell these firearms including to drug

4    dealers.

5            More photographs that the defendant took

6    depicting firearms.  Again, the metadata establishing

7    that these photos were taken on July 21, 2023.  More

8    firearms, photographs taken by the defendant on July

9    21, 2023.  July 21, 2023, a photograph of a firearm

10   that we've seen in an earlier photograph next to drugs

11   and drug paraphernalia.  Here it is in the defendant's

12   hand.  And then we have a photo from the defendant's

13   phone on July 21, 2023, depicting a shotgun and a

14   human leg and a bed with shotgun shells, and a few

15   things I point out about this photo, Judge, A, that's

16   the shotgun we seized from his house, B, those shells

17   are the same shells that are littered on the floor

18   when law enforcement responds to the death of CQ, and

19   C, those same shells were recovered during the search

20   warrant by law enforcement.

21           Here's more photographs of the shotgun that

22   I'm sure the defendant is going to deny possessing

23   July 21, 2023.  We have a laser sight coming off of a

24   shotgun with spikes on the end of it and we're going

25   to get into more about what the defendant did with

1  this shotgun in a little bit.  Here's a photo seized

2  from the phone of CQ who was with the defendant in the

3  days before her death.  So we're talking about July

4  28, 29, July 30, leading up to her death on or about

5  August 1.  This photo shows the defendant holding the

6  shotgun that was seized from his house.

7          THE COURT:  How do you know that's the

8  defendant?

9          MR. COOPER:  Judge, the same shirt was

10  seized from the -- or a shirt that appears to be the

11  exact same shirt was seized from the defendant's

12  residence and I would submit to the Court that between

13  the photos from the defendant's phone of the same

14  shotgun and the male who fits the defendant's

15  description holding the shotgun and the circumstances

16  that CQ was with this defendant that entire weekend

17  and this photo was pulled from her phone that you can

18  make an obvious inference that it's the defendant.

19          Text messages from the defendant's phone

20  that establish that the defendant is a drug

21  trafficker.  Now, again Judge, I'm going to proffer to

22  the court, but Mr. Bagley has all of these text

23  messages, and I would just like to read some of them

24  to Your Honor now.  I can't pull them up on the screen

25  but these are pulled from a cell bright extraction of

16

1    the defendant's cell phone.  All this has been turned

2    over.  The defendant has text messages with the

3    contact stored in his phone, one of them, this is a

4    contact stored as Bill.  July 28, 2023.  Simon texts

5    175 for 3 Gs for the next one to spend and much more

6    after that and boi.  Judge, that text message is an

7    obvious drug selling text message.  175 for three Gs,

8    three grams for the next one to spend.  The next

9    message after that and much more after that and boi,

10   B-O-I.

11          Now, you'll see if you reviewed all these

12   texts from the phone, boi B-O-I and food over and over

13   again.  Boi and food are terms that are constantly

14   used in Western New York to describe heroin, heroin

15   and fentanyl.  Those text messages occur over and over

16   again in the defendant's phone, and I'm just going to

17   read you a very brief summary of the you hundreds and

18   hundreds of messages where this defendant is selling

19   drugs.

20          What's particularly disturbing though are

21   text messages that he has to a person named Clinic

22   Shawn, and Judge, in these text messages, it's

23   apparent that the defendant is picking his customer

24   base from people that are going to methadone clinics

25   trying to get sober.  And so what the defendant does

1    is pick off people trying to get help and sell them

2    fentanyl.

3            Here are these texts to Clinic Shawn.  He

4    says good soft hard and food.  I'll take care of you.

5    Soft being powder cocaine, hard being crack cocaine

6    and food being fentanyl or heroin.  Clinic Shawn

7    responds to the defendant okay, what's good?  There's

8    text messages with a source of supply in the

9    defendant's phone and the defendant has this person

10   stored as a contact called Deal.

11           Those text messages discuss drug trafficking

12   where it's apparent that that's a source where this

13   defendant gets his fentanyl from.  The defendant texts

14   this drug dealer about selling him a high point

15   pistol.  The drug dealer says, hey, high point still

16   around?  And Simon responds yeah.  Four hours later,

17   Simon texts this drug dealer saved in his phone as

18   Deal and says high point and Deal responds he ain't

19   want it.  Take a picture with the 50 in the hand

20   joint.

21           Now, high point is a semi automatic pistol,

22   Judge.  They're talking about selling firearms to drug

23   dealers here.  July 8, this defendant texts Deal and

24   he says silver mini Draco with four clips for 1325 and

25   Deal responds let me see it and Simon responds got to

1    get a pic.  I tried it out on the fourth.  It's ill.

2              THE COURT:  It's what?

3              MR. COOPER:  Ill.  It's awesome, very cool.

4    Great gun.  On July 10, Simon texts Deal asking where

5    he is, and Deal tells Simon run to the clinic and see

6    who needs some boi.  I'm going to give you a few

7    samples to give away.  It's disgusting behavior,

8    Judge.  Simon responds that's like perfect timing

9    because I just had four people hit me up and I'm

10   riding with three more who want it.  Then Simon texts

11   I'm about 30 minutes away and I need one and one

12   again.

13             Now, again, working on drug investigations

14   for a long time, Judge, one and one again is in

15   reference to one gram of fentanyl and one gram of

16   crack cocaine or one gram of heroin and one gram of

17   crack.  This is common drug trafficker parlance.  They

18   discuss money and the drug source of supply complains

19   that Simon is not paying him with straight money.

20   (There was a pause in the proceeding.)

21             MR. COOPER:  There's I would say

22   approximately two dozen separate conversations with

23   different people, either drug customers or drug

24   traffickers, that occur during the month of July

25   through August when the phone is seized by law

1  enforcement.  The phone is filled with drug

2  trafficking.  One thing I'd like to point out to the

3  Court is that the defendant was with this person CQ

4  who was a witness in a federal case the weekend of

5  July 29 and 30 leading up to August 1 when CQ is

6  called in dead by this defendant.

7       The defendant during those same dates over

8  that weekend, July 27, July 28, is texting people

9  indicating that he has heroin, fentanyl or crack

10  cocaine for sale, and I can read some of those text

11  messages to the Court.  So one example, Judge, on July

12  27, somebody asks the defendant, Yo, can you 100% get

13  addies or adderall?  And this defendant responds just

14  sold 45 in the last hour.  So that's just adderall,

15  but I want to find this fentanyl text message from

16  that same weekend, that July 28 weekend.

17  (There was a pause in the proceeding.)

18       MR. COOPER:  Okay.  So July 26 is the text

19  messages to Clinic Shawn where the defendant is

20  indicating he has good soft and hard and food and

21  he'll take care of Clinic Shawn.  July 28, 2023, this

22  is the weekend before CQ's death while the defendant

23  is with CQ.  Simon texts said he has 175 for three

24  grams for the next one to spend and much more after

25  that and boi, and as we've discussed, boi is a

1    reference to fentanyl or heroin.  The defendant texts

2    again and says $70 for a bun, B-U-N, which is a

3    shortened term for bundle which is the way that heroin

4    or fentanyl is packaged in small bags wrapped in a

5    bundle.

6           That same text messages advertising $175 for

7    three grams is sent to numerous people as an outgoing

8    text message in the defendant's phone.  On July 26,

9    2023, the defendant texts a contact in his phone

10   stored as Brandon Big and says you like that pic I

11   sent you?  That shit is special edition with a heat

12   activated beam.  It holds 13 but small and light as

13   fuck.  Brandon Big responds what pics?  And then three

14   hours later texts Ooouuuu and Simon responds fire, I

15   told you.

16          So what we know about the defendant just

17   from reviewing his cell phone, Judge, is that he makes

18   a profit, makes a living selling drugs to people

19   trying to get sober at methadone clinics, that he

20   tries to sell his guns to drug dealers.  That's

21   corroborated by the photographs filled in his phone of

22   guns and drugs, and it's corroborated by witness

23   testimony that the Government has developed during the

24   course of its investigation.  I'm going to pick back

25   up now where we left off in the power point

1   presentation.  Hopefully.  Come on, Power Point.

2   (There was a pause in the proceeding.)

3          MR. COOPER:  So this is the shotgun that you

4   see depicted in both the photograph from the

5   defendant's phone and the photograph from CQ's phone.

6   This is a photograph taken by law enforcement when

7   they searched the defendant's house on August 8.  If

8   you look closely on the left side of the photograph

9   you can see the same spikes on the front of this

10  shotgun that existed in those pictures.  They're a

11  very specific item.

12          THE COURT:  Go back to that photo.  Where --

13  it looks like it's almost in an attic or something.

14  Do you know where?

15          MR. COOPER:  That's exactly where it is,

16  Judge.  So the search warrant occurred on August 8

17  which is a week after the defendant called law

18  enforcement and reported CQ as dead.

19          THE COURT:  Right.

20          MR. COOPER:  I'm going to get into some of

21  the things that law enforcement believes that the

22  defendant did at the scene where that occurred in a

23  minute, but the gun is tossed up in the attic in the

24  rafters by the time law enforcement searchs on August

25  8.  Here's some other photos from the search warrant

1    at the defendant's residence on August 8.  On the

2    bottom left corner is the body armor.

3          Now, that same body armor is referenced in

4    text messages that the defendant exchanges with

5    actually as recent as July 28, 2023, the defendant

6    sends a text message indicating that he's wearing his

7    vest during what appears to be a confrontation.

8    There's a digital scale.  There's a white powdery

9    substance and a razor blade.

10          Don't need to be a rocket scientist to know

11   that that's drugs or cut.  I doubt it's baking soda.

12   And in the center photo here, we have a digital scale,

13   tin foil, a straw.  These are items seized after the

14   defendant's had an opportunity to clean his house up.

15          Continuing with the factors under 3142(g),

16   the history and characteristics of this defendant.

17   The defendant has a significant substance abuse

18   history.  The defendant has a prior probation um

19   violation/revocation.  The nature and seriousness of

20   the danger to any person or the community that would

21   be posed by this defendant's release.

22          Well, first of all, the obvious.  He's

23   selling drugs, possessing firearms and body armor.

24   That poses a serious threat to society.  However, what

25   I would like to spend some time with the Court on now

1    is witness tampering and intimidation because --

2              THE COURT:  Before you do that --

3              MR. COOPER:  Yeah.

4              THE COURT:  -- he's not charged with any of

5    that now, is he?

6              MR. COOPER:  Not in this indictment, Judge.

7              THE COURT:  In any other indictment?

8              MR. COOPER:  Judge, I would submit to the

9    Court that that's going to be coming in the near

10   future.

11             THE COURT:  Okay.  Well --

12             MR. COOPER:  And then there's both testimony

13   and corroboration which you are going to see in a

14   second about this witness tampering that occurred, and

15   something I expect you are going to hear during the

16   course of the detention hearing today is that the

17   defendant offered to turn himself in or self surrender

18   to the FBI but this witness tampering incident and

19   there's mor than one witness tampering incident

20   occurred after the defendant called and offered to

21   turn himself into the FBI.

22             THE COURT:  Well --

23             MR. COOPER:  So what we have here is reports

24   from witnesses, multiple witnesses, more than one with

25   corroborating evidence that between the time of the

1    search warrant at the defendant's residence and the

2    time of his arrest, the defendant communicated, and it

3    says with at least one individual, I can confirm for

4    the court now it's at least two individuals and

5    attempted to intimidate and threaten them from

6    communicating with law enforcement.

7            THE COURT:  All right.  Well, I'll listen to

8    your proffer in that regard, but I just want to note

9    that he is not charged currently with witness

10   tampering, and I'm going to take that into account in

11   assessing all of the factors.

12           MR. COOPER:  Well, Judge --

13           MR. BAGLEY:  Judge, this is also -

14           THE COURT:  No need to argue with me, Mr.

15   Cooper.  I said I will listen to your proffer, but I

16   just want it noted that he's not currently charged

17   with any of that.  So go ahead.

18           MR. COOPER:  Absolutely, Judge.  So I would

19   ask the Court to keep open eyes and open mind to the

20   information in front of you regardless of whether an

21   indictment has been returned yet on these charges

22   because obviously it takes time to present cases,

23   bring witnesses into the Grand Jury.  It's not a

24   question of if so much as a question of when.

25           THE COURT:  I've noted your position and

1    you've noted my position.

2              MR. COOPER:  Yes, Judge.

3              THE COURT:  Okay.  Go ahead.

4              MR. COOPER:  The next slide up on your

5    screen here is a cash app payment from this defendant

6    on August 14, and I don't know if the Court uses cash

7    app or Venmo or these electronic payment systems --

8              THE COURT:  None of the above.  I'm sorry.

9              MR. COOPER:  I'm sorry?

10             THE COURT:  I do not.  My kids do I'm sure.

11             MR. COOPER:  So just -- and I didn't mean

12   that with disrespect.

13             THE COURT:  No, no.  I appreciate it.

14             MR. COOPER:  I just wanted to educate the

15   Court, when you send a payment on Venmo or CashApp,

16   you have to include a memo or a note with it.

17             THE COURT:  Okay.

18             MR. COOPER:  So I send you $5 and I say for

19   coffee because you bought me a cup of coffee, I have

20   to include that text some sort of comment.  It can

21   even be an emoji like a smiley face.

22             THE COURT:  Okay.

23             MR. COOPER:  In this instance what we have

24   is the defendant sending a CashApp payment to a

25   witness and the defendant sends $1 so a nominal amount

1    and the message is for sixth amendment.  Now, this is

2    before the defendant is even arrested by the FBI.

3    It's after his house has been searched and it's after

4    he's offered to turn himself in, and he's sending

5    messages to witnesses or people he believes are

6    witnesses against him and telling him for sixth

7    amendment.

8              Now, I can tell the Court that the people

9    who received those messages didn't even know what the

10   sixth amendment meant so they Googled it, and when

11   they Googled it they saw that it was the right to

12   confront your accuser, and the people who received

13   these messages, and it's more than one person,

14   perceived it as a threat from this defendant.

15             The nature and seriousness of the danger to

16   any person or to the community that would be posed by

17   the defendant's release.  One of the things I want to

18   show the Court is what was observed at defendant's

19   house during the search warrant.  During the search on

20   August 8, they found numerous identification documents

21   of other individuals inside the defendant's residence.

22             These IDs included someone else's license to

23   carry firearms, someone else's medical marijuana card,

24   someone else's driver's license, all in the names and

25   bearing photographs of other individuals, and these

1   individuals all share common physical characteristics

2   as in being white males with this defendant.

3           But there's more than that.  The defendant

4   has specifically impersonated an individual by the

5   name of Scott Drummond previously.  Now, we could

6   receive witness testimony from numerous individuals

7   that they've personally witnessed the defendant

8   pretending to be this other person named Scott

9   Drummond, in possession of photo ID in the name of

10  Scott Drummond with this defendant's photo on it, and

11  what we have here in the green is a text message that

12  the defendant sends to what I believe to be a bail

13  bondsman pretending that he's Scott Drummond.

14          And so he's taking on the identity of

15  another person and he's using that in association with

16  essentially a participant in the criminal justice

17  system.  He's trying to bailout his girlfriend from

18  her burglary case and he writes down that he's Scott

19  Drummond from Wellsville.  When he was arrested, he

20  was in the wallet of Scott Drummond.  When law

21  enforcement responded to the death of CQ, the

22  defendant told them that Scott Drummond lived in his

23  house and it was Scott Drummond's side of the house

24  where CQ was found dead.  That was a lie.

25          The defendant lived in the one room that's

1    occupied in the house.  The remaining rooms of the

2    house are completely delipidated but the defendant

3    represented to law enforcement that there was this

4    essentially a duplex and that he lived in the other

5    side with the attempted to displease distance himself

6    from the dead body inside of his house.

7            Law enforcement took 300 plus photographs

8    from inside that house during the search warrant.

9    There's no chance anyone lived in the other side.  The

10   rooms are completely filled with trash.  There's holes

11   in the ceiling.  There's power tools laying all over

12   the floor.  There's no functional bed, no functional

13   couch, no functional refrigerator, no functional

14   bathroom, but he lies to the police when they show up

15   at the scene of this um -- this woman's death to

16   attempt to distance himself.

17           There's also photographs in the defendant's

18   phone of sensitive Government credentials.  Now,

19   because that's part of an on going investigation, I'm

20   not going to post those photographs in this power

21   point.  They've been turned over to the defendant and

22   to defense counsel under the terms of the protective

23   order that we've agreed upon, and I have them here in

24   a folder which I can hand up to the court so you can

25   look at them, I would request that essentially the

1   Court review them under seal so that they are not

2   publicly displayed to the gallery, but Mr. Bagley has

3   them, I have them and I'd like to hand them up to the

4   Court with your permission.

5           THE COURT:  Okay.  Um, Mr. Cooper, back to

6   this Scott Drummond.  Are you saying that he's a -- is

7   he a real person?

8           MR. COOPER:  Sure is, Judge.

9           THE COURT:  Okay.  And these documents were

10  found where?

11          MR. COOPER:  So these were photographed and

12  the photographs were in the defendant's phone.

13          THE COURT:  Okay.  Do you know whether the

14  person --

15          MR. COOPER:  There's an ongoing

16  investigation and that's all I can say about -- I

17  don't have an update.  I know there's an investigation

18  by an appropriate agency, but I don't want to speak

19  publicly more than --

20          THE COURT:  I'm just wondering whether this

21  person is a real person or not or you don't know.

22          MR. BAGLEY:  Yes.  It's a real person,

23  Judge.

24          THE COURT:  Okay.  All right.  Thank you.

25          MR. BAGLEY:  The defendant's actions

1    surrounding the death of Government witness CQ which

2    is currently under investigation.  On August 1 at 6

3    p.m. the defendant calls 911 to report that CQ was

4    present in his residence and apparently dead.  By the

5    time the defendant called 911 to report her death,

6    CQ's body had already become cold to the touch and

7    stiff.

8              By the time law enforcement arrived, it was

9    apparent that she had been dead for a significant

10   period of time before her death was reported.  The

11   area she was dead, the living space within 296 Scott

12   Avenue is very small.  There's essentially a studio

13   apartment style in one of the rooms of the house and

14   that's essentially the only room of the house that

15   somebody could occupy or live in.  So it's not like

16   the defendant was upstairs in the attic where you saw

17   the shotgun.  This is the area that's occupied of the

18   house.  That's where she's found dead.  She's cold to

19   the touch, rigid and stiff.

20             Local law enforcement believed when they

21   arrived that the defendant was high on Methamphetamine

22   and they observed him drinking large quantities of

23   straight liquor while they are attempting to interview

24   him about this person's death.  The defendant appeared

25   evasive to members of local law enforcement about her

death.  He made inconsistent statements to them regarding the circumstances surrounding her death. While speaking to local law enforcement, the defendant claimed that CQ had committed suicide.

Separately, the defendant also made statements to local law enforcement saying to make sure the cause of death is found out.  I will be the suspect if that's what's necessary to find out what happened to her.  The defendant initially told local law enforcement that he was not present with CQ at the time of her death.  He claimed he lived in the upstairs of the residence.

This statement by the defendant is demonstratively false as I've indicated to the court. There's dozens of the pictures of the upstairs of 296 Scott Avenue, and nobody lived there.  The defendant later told the FBI during a recorded interview that he was sleeping next to CQ and didn't realize that she had died.  So that's already two diametrically opposed accounts of his whereabouts and his involvement in CQ's death, and we know from the text messages, Judge, that he had food or fentanyl for sale the weekend that he was with CQ.

It's impossible to believe that the defendant was unaware that CQ was dead given the state

1    of her body at the time law enforcement responded to

2    the scene, and I have photographs that I can show or

3    hand up to the Court regarding the state of CQ's body

4    at the time law enforcement arrived.  Again, I'm not

5    going to publicly display those, but with Your Honor's

6    permission, I'll hand them up.

7              THE COURT:  Mr. Bagley has had access to

8    them?

9              MR. COOPER:  Judge, I believe that those

10   were turned over in the packet of discovery, but I can

11   hand them a copy as well when I hand them up to you.

12   (There was a pause in the proceeding.)

13             MR. COOPER:  On top of being deceptive with

14   law enforcement by his statements about CQ's death,

15   the defendant was also um when law enforcement goes to

16   the house to conduct a search they find a fire pit

17   which is depicted in the bottom right corner of this

18   power point slide, and in the fire pit is the

19   comfortable from the bed as if it's ready to be

20   burned.

21             This is the bed that CQ was found dead in.

22   Law enforcement, the locals from Wellsville when that

23   he arrived, indicated to the FBI in subsequent

24   interviews that they believed that the scene had been

25   cleaned up or tampered with by this defendant before

1   he called them.  They indicated that they would

2   generally expect to find more packaging and

3   paraphernalia or items consistent with opiate use near

4   a person's body if they had suffered an accidental

5   overdose.

6          Those items were not present by the time law

7   enforcement responded to the 911 call.  It's suspected

8   that the defendant hid items including firearms and

9   controlled substances before calling 911.  After being

10  arrested in Depew on August 2, the defendant made

11  unsolicited statements to local law enforcement about

12  CQ's death.  The defendant claimed that he had heard

13  CQ on the phone with her lawyer and that she was

14  telling her lawyer, that's a lawyer that this court

15  knows, that she intended to kill or harm herself.  The

16  Government has spoken with that attorney who

17  acknowledged that he spoke with CQ and indicated that

18  CQ in no way mentioned harming herself and that she

19  planned on attending a meeting with him and the

20  Government later that week.

21          So the defendant is lying to the police

22  unsolicited, just throwing this information out there

23  to put out a narrative that CQ was planning to harm

24  herself, but the attorney who practices in this

25  courthouse who represented this woman said that did

1    not happen.  She did not tell me she planned on

2    harming herself.  She was planning to come to a

3    meeting with me and the Government the following week.

4    So the defendant is lying to law enforcement and

5    putting out this false narrative that she harmed

6    herself and the attorney is denying that and saying

7    that did not happen.

8              Judge, before I get to the burden, there's

9    additional newly developed information, and again,

10   because the way this works, we don't always get the

11   information the same day that a person is charged by a

12   complaint.  This is not charged in the indictment,

13   yet, but I'm going to proffer to you now that there

14   are multiple witnesses to an incident where the

15   defendant used the same shotgun that you've seen in

16   those pictures to hold a drug user against his will in

17   the defendant's basement for upwards of three hours,

18   that he struck that person with the spikes on the

19   front of that shotgun.

20             That incident was witnessed by another

21   individual.  Both of those individuals corroborate

22   each other and describe the defendant whose wrapped

23   himself in plastic from head to toe holding a drug

24   user captive in his basement for over three hours.

25   The Government is continuing to investigate that

1    information.

2           However, after the information came to the

3    Government, we rereviewed the photos from the search

4    warrant conducted at the defendant's house, and sure

5    enough, the photos from the defendant's basement show

6    plastic um drop cloth, essentially what painters would

7    use, and a white plastic chair.  Now, that's exactly

8    what was described by this witness who essentially

9    says the defendant lured him to the house by offering

10   him drugs and then brought him down into the basement

11   where the defendant was -- had set-up plastic from

12   floor to ceiling in a little like on three sides and a

13   white chair and that he then shoved the person into

14   the chair, struck the person with the shotgun and held

15   the person against their will for hours in his

16   basement.

17          The same plastic -- or the plastic chair

18   that was described by the witnesses and the plastic

19   drop cloth that was described by witnesses is still in

20   the basement when law enforcement goes and photographs

21   the house.  They didn't even know that they were

22   looking for it, but afterwards while interviewing

23   people who've purchased drugs from the defendant, the

24   Government becomes aware of this incredibly disturbing

25   conduct where the defendant has used that shotgun to

1    beat someone and essentially kidnap them by holding

2    them against their will using the instrumentality of

3    commerce which would be a cell phone to lure them to

4    the house.

5            So the defendant poses an obvious danger to

6    the community.  The pictures, the text messages, the

7    threats over CashApp should all convince this Court of

8    that by clear and convincing evidence.  The defendant

9    also imposes a risk of flight.  The Court should be

10   convinced of that by the defendant's possession of

11   numerous IDs, the defendant's willingness to use the

12   identity of another individual repeatedly based on

13   both witness testimony and the text messages in his

14   own phone.

15           But I would point out that the burden first

16   here is with the defendant to overcome the two

17   presumptions that apply in this case, and I don't

18   believe he could even get that far, but if the Court

19   does believe the presumptions have been overcome, the

20   Government has proven anyway by clear and convincing

21   evidence that he's a danger and a flight risk.

22           THE COURT:  Okay.  Thank you.  Mr. Bagley?

23           MR. BAGLEY:  Judge, the -- you know, the

24   rules in the detention hearing are pretty liberal, but

25   um we've gone pretty far off field from -- and I

1    didn't interrupt Mr. Cooper in his um -- in his

2    stringent presentation this afternoon, um, but, you

3    know, to take for example this last accusation that um

4    apparently comes from some information -- somebody

5    said to somebody who said to somebody who told the

6    Government that something happened in a basement that

7    I have absolutely no knowledge of, no ability to

8    combat, no ability to argue against, Judge, puts us in

9    a very unfair position.  What you have heard here this

10   morning and into this afternoon is essentially a

11   closing argument made without the ability for me to

12   present any kind of defense to that closing argument.

13            THE COURT:  Well, why don't you focus on um

14   what has been charged?

15            MR. BAGLEY:  And I'm --

16            THE COURT:  As I indicated a few minutes

17   ago, I was listening to the proffer of uncharged

18   events and I take that proffer of uncharged events and

19   I take that proffer very seriously, but um, I think my

20   focus will be on what has been charged which in and of

21   itself seems to me to be very troublesome.  So go

22   ahead.

23            MR. BAGLEY:  Judge, and I understand, and I

24   will focus on that.  Um, I do think part of what I'd

25   like to say though is -- is that, you know, when I say

1    when I compare this to a closing argument, obviously

2    if this were a trial, we -- both the Government and

3    the defense would have been able to um put on

4    witnesses, would have had months and months and going

5    on years in order to investigate in order to um bring

6    defenses.

7            In fact, the entire time almost that Mr.

8    Cooper was speaking, Mr. Gogolack was trying to talk

9    to me in my other ear trying to explain and clarify

10   and combat and dispute a lot of the things if not all

11   the things that Mr. Cooper was saying.  So obviously,

12   if this were a trial, I would stand up and I would

13   have months and months and I would use my witnesses,

14   but I'm at the disadvantage now because the Government

15   has been investigating this case since the beginning

16   of August.

17           They didn't charge Mr. Gogolack until the

18   end of um -- end of August, and so they have um months

19   of time to be able to put in and put their spin on the

20   things that you've seen in front of you this morning.

21   So for example, what do I mean when I say spin?  One

22   example of that, Judge, and again, I can't go through

23   every single piece of evidence that they've presented

24   to me this morning and um back and forth with them on

25   that, but with respect to for instance the photos that

1    they showed you in the power point, they mentioned --

2    the Government mentioned that one was was recently

3    taken as of July 21, 2023.

4           I don't know if you notice this, Judge, but

5    in fact all of the dates on those photos were July 21,

6    2023.  So that raises a host of questions.  Why are

7    all of those -- why are all of those pictures dated

8    July 21, 2023?  I think it stands to reason that the

9    picture wasn't taken on July 21, 2023, but rather that

10   it was uploaded or saved or done some sort of um --

11   something happened with the -- with the device on that

12   date rather than that it was taken.

13          So that tends to suggest that we don't know

14   the date in fact of when this picture -- when those

15   pictures were taken.  We don't know in fact with

16   respect to the pictures, whether those pictures that

17   are on -- allegedly on his phone um were taken by Mr.

18   Gogolack.  You in fact asked a question, Judge, I

19   think a fair one about, whether or not that um picture

20   that the Government claims depicts Mr. Gogolack

21   holding a firearm is in fact Mr. Gogolack.  And so

22   these are all just -- just brief and short examples of

23   the types of things that um again make it -- make it

24   pretty unfair for us to be able to sit here and combat

25   against a closing argument that the Government has

1    clearly spent hours putting together when the only --

2    the only determination before this court at this

3    time,.

4            Judge, as you know is whether Mr. Gogolack

5    poses such a serious risk of flight that he is going

6    to flee from this charge and whether or not he is a

7    danger, and whether or not, Judge, and on that last

8    point of course, whether or not there are conditions

9    that the Court can impose that would alleviate any

10   concerns that the Court may have with respect to

11   dangerousness.

12           Um, the Government did not talk about

13   several of the factors in 3142(g), Judge, which are

14   family ties, employment, length of residence,

15   financial resources.  It did talk, Judge, a little bit

16   about -- the Government that is did talk a little bit

17   about drug and alcohol abuse and that's something that

18   I would like to focus on.

19           The pre-trial services report is replete

20   with um Mr. Gogolack admitting candidly that he is a

21   user of controlled substances, that he has a

22   controlled substance um problem, and that he um is --

23   struggles with that, that he used as recently as um

24   days and hours prior to his arrest.  And so that is

25   proffered to the Court as a reason to detain Mr.

1    Gogolack.

2            I would submit, Judge, that it's a reason to

3    release Mr. Gogolack and to get him some treatment.

4    Um, a jail is not a place where folks who are

5    suffering from controlled substance disorders get any

6    kind of treatment.  Um, they may go attend a meeting

7    or two, Judge, but it is not the same intensity as um

8    a facility designed to treat folks in Mr. Gogolack's

9    situation, Judge.

10            So I'll cut to the chase a little bit.  What

11   my proposal is going to be to the Court is that Mr.

12   Gogolack be released to a treatment facility such as

13   Horizon or Stutesman and I spoke with the probation

14   officer -- officers before today's court appearance.

15   Um, typically, that as you know, Judge, having dealt

16   with this probably hundreds of times that there's not

17   always a bed available.

18            I'm not asking that Mr. Gogolack be released

19   today and um on his own recognizance obviously, Judge.

20   What I'm asking is that um in fact you do detain Mr.

21   Gogolack but that you detain him only until the point

22   that a bed becomes available at one of these treatment

23   facilities.  I know that the Court is often concerned

24   about the security of these facilities in terms of

25   whether or not, um, you know, Mr. Gogolack is going to

1   be under -- under lock and key.  What I can report to

2   the court, Judge, is that although it's not a jail by

3   any means, he's under constant supervision.

4          There are 24 hours a day.  So were Mr.

5   Gogolack not to be where he was supposed to be, it

6   would be discovered within short order.  In fact, I

7   had a client not too long ago, Judge, that was

8   released from one -- because he was doing well, he was

9   released from one more stringent um location to a less

10  stringent one where he's granted more liberties.  So

11  Mr. Gogolack were he to be admitted into this type of

12  facility would be in that first situation.

13         Again, constant supervision 24 hours a day,

14  several people on site that are there designed to

15  first of all of course treat Mr. Gogolack for his

16  serious substance abuse problems, and two, um, to make

17  sure that he's not going anywhere, and if he were,

18  probation would find out about it in short order.

19         And so, Judge, you know, that ties in a

20  little bit again to the coloring that you saw this

21  morning.  Um, you know, to take -- you know, the

22  Government got to look through Mr. Gogolack's phone.

23  They got a month and a half in order to do that, and

24  they got to pick out the things that they thought were

25  the most damming for Mr. Gogolack, and then they got

1   to sit there and argue to the Court that certain --

2   make their interpretations as to what those things

3   mean; right?  This isn't a case where Mr. Gogolack had

4   sales to an undercover officer.

5         This isn't a case where there's a

6   confidential informant who has come in and said Mr.

7   Gogolack sold me drugs.  Instead they found pictures

8   for example on his phone of a bag of a white substance

9   and it is claimed that Mr. Gogolack is selling this

10   white substance.  That, Judge, is good enough for a

11   proffer I suppose under the liberal rules of evidence

12   that apply here today, but I'd ask the Court to apply

13   some healthy skepticism to that because again we're

14   not in a position to be able to combat that just yet.

15   And I think based on what Mr. Gogolack has been trying

16   to tell me the entire detention hearing that down the

17   line we will be in such a position.

18         Judge, Mr. Gogolack's father is here today.

19   His name is Paul.  Um, Paul is a lifelong resident of

20   the Western New York area as is Simon.  Um, he does

21   have family ties to this area.  Mr. Gogolack has also

22   been employed for some time.  He owns his own small

23   business in which he um repairs small engines and he

24   does odd construction jobs, Judge.  In fact, one of

25   the things that Mr. Gogolack is concerned about upon

1    the prospect of detention is that there are jobs out

2    there that he's only half finished and that he would

3    like to conclude.  So that -- you know, that's a

4    factor that the Congress has said the Court must

5    consider and it's one that I think works in Mr.

6    Gogolack's favor.

7            Another factor, Judge, that the Court can

8    consider is financial resources, and I think um many

9    of my clients are in a position where they don't have

10   a lot of financial resource, and although Mr. Gogolack

11   does work, he's not a wealthy man.  What that means I

12   think, Judge, what I'd ask the Court to consider with

13   respect to that is that he doesn't have the means to

14   buy himself a ticket flying out of this country or

15   anything um of that nature, Judge.

16           You know, the folks who in my experience

17   actually flee from charges which are few and far

18   between, we sit here and we argue about this on a

19   daily basis, but there's a handful of cases out of the

20   hundreds and thousands that apply where a defendant

21   has actually fled from a charge, and those handful,

22   Judge, are usually the folks who have the means to do

23   that.  Mr. Gogolack does not.  Mr. Gogolack lives here

24   his whole life.  His family lives here his whole life.

25   He's not going to go anywhere, Judge.  He's eager, as

1   evidenced by this detention hearing, to defend against

2   these charges.

3          So Judge, I would ask that you consider

4   those um -- those circumstances as you -- the

5   Government tried to preempt a few of the things that

6   um it correctly assumed Mr. Gogolack and I were going

7   to present this morning and including the fact that he

8   did call the FBI at one point because he was -- he did

9   know he was under um investigation because of this

10  unfortunate circumstances with the death that occurred

11  in his residence, and said look, you want me to come

12  here.  Here I am.  Come get me.  Where can I turn

13  myself in?  Again, that shows that Mr. Gogolack is not

14  a flight risk.

15         Nor Judge, I think it should be pointed out

16  that there's a lot of circumstances here that are

17  again presented in a light if I may least favorable to

18  Mr. Gogolack.  Um, you know, there was drugs found in

19  a residence and um -- and it happened to be that an

20  unfortunate situation occurred where um this woman

21  passed away while she was in the same residence as Mr.

22  Gogolack, but there's no other connection between him

23  and this woman.  He didn't -- he's known the woman for

24  some time, but they just met recently again 10 -- or

25  two weeks before this incident occurred.

1           So Judge, what it appears to me is that

2    there's a wrong place wrong time situation.  If Mr.

3    Gogolack who, you know, the Government makes a lot

4    about him trying to distance himself from the fact

5    that this woman died, but of course, it's he who calls

6    the police that morning when he finds her

7    unresponsive.  So if he wanted to distance himself

8    from the situation, he wouldn't have called and

9    reported the death, and he wouldn't have done all the

10   things that he did in order to try to make sure that

11   this does get solved um because Mr. Gogolack is in

12   fact interested in getting this um resolved.

13          Um so, Judge, for those reasons, again, my

14   proposal is um understanding that the Court must

15   consider the weight of evidence but it's only one.

16   It's only one factor that the Court has to consider,

17   and it's the least important factor because Mr.

18   Gogolack as you again had said, Judge, already this

19   morning is presumed innocent of these charges.  So

20   despite, again, I will say fancy presentation from the

21   Government on this point, um, this is not a trial and

22   Mr. Gogolack is presumed innocent of these charges,

23   and so for those reasons, I'd ask that you would

24   release him to either Horizon or Stutesman, a place

25   where he's going to get intensive supervision and

1    intensive care, and you don't have to do that, Judge,

2    until there's a bed available, and there's going to be

3    a host of other conditions that the Court is -- we're

4    going to have no objections to that the Court I'm sure

5    is going to apply and that probation is going to

6    recommend that are going to be -- amount to the least

7    restrictive as the Court knows that's the requirement

8    to impose the least restrictive conditions in order

9    assure his appearance and ensure the safety of the

10   communication.

11            So while jail may be of course the easiest

12   answer, it's not what the Court is obligated to

13   consider.  What the Court is obligated to consider is

14   imposing the least restrictive conditions in order to

15   meet those two factors, Judge.  So I would submit that

16   the least constructive condition is in fact this

17   treatment facility.

18            THE COURT:  Okay.  Thank you.

19            MR. COOPER:  Judge, I just want --

20            THE COURT:  Very briefly.

21            MR. COOPER:  -- to hit on a couple things,

22   sure.  The first thing is with respect to --and I

23   understand the Court's position, I'm just trying to

24   make a record.  With respect to the witness tampering

25   despite the fact that it's not charged, in United

1   States versus Vendetti, a District Court case from the

2   Western District of New York, May 26, 2011, the court

3   held the Second Circuit has recognized that pre

4   indictment efforts to persuade witnesses still

5   constitute witness tampering and are relevant to

6   assessing a defendant's danger to a community and

7   potential future conduct.

8           And so I believe it is something that this

9   Court should take very seriously.  It's not just two

10  witnesses who have told the Government about it, and

11  it's not third level hearsay.  It's the people

12  themselves coming here and saying this happened to me,

13  but we have corroboration.  You looked at it.  So I

14  think you should consider that very seriously.

15          The second thing that I would say, Judge,

16  with respect to putting the defendant in a treatment

17  facility, I come to Your Honor frequently in these

18  sorts of proceedings, and I have on multiple occasions

19  agreed to that, consented to it.  It's something that

20  I take seriously is if a person needs to be in

21  treatment and if that's an acceptable position for the

22  Government to take, I go along with that.

23          In this instance, Judge, that would be

24  putting the fox in the hen house.  This defendant is

25  the person picking off the people in treatment to sell

1    them fentanyl.  And if you go and send the defendant

2    to a treatment facility and he starts giving dope to

3    people who are trying to get well, that would be on

4    this court.  It's not something that we need to do is

5    take that chance, put the defendant in a treatment

6    facility where he can continue to sell drugs to people

7    trying to get treatment which is what he's obviously

8    been doing.

9            It's demonstrated in his text messages.

10   It's demonstrated by witness testimony.  So the

11   Government is strongly opposed to that.  It does not

12   aswage the concerns about the danger that he's poses

13   to the community.  The least restrictive means in this

14   case is jail, Judge.

15           THE COURT:  All right, thank you.  Um, the

16   defendant is presumed innocent of the charges at this

17   point.  That's a presumption for trial, but under the

18   bail reform act, I'm entitled and obligated to

19   consider many factors, one of which is the weight of

20   the evidence, and as I said to Mr. Cooper earlier and

21   in fairness to the defendant and Mr. Bagley, while I

22   do not ignore the proffer relative to uncharged

23   incidents that may end up being charged, I give less

24   weight to the proffer in that regard than I do to the

25   proffer that falls within the scope of what's already

1    been charged, and the proffer as to what's already

2    been charged is very significant, very detailed.

3           It indicates -- regardless of when these

4    photos were taken, it indicates that um photos from

5    his cell phone clearly, strongly suggest that he was

6    dealing in both drugs and in firearms at some point.

7    Um, the fact that the shotgun um was apparently

8    located in the attic of the house suggests that some

9    effort was made to conceal his involvement in the

10   dealing.

11          Um, there is a presumption against release

12   based on the nature of the charges.  If I merely

13   confine myself, and I do, um, to the proffer relative

14   to what's been charged, I find that he has not

15   rebutted the presumption, and I agree with -- I don't

16   always agree with Mr. Cooper, he knows that, but I do

17   agree that um placing the defendant in a treatment

18   facility given what I've heard from the proffer would

19   not certainly be in -- it might be in his best

20   interest.  It's certainly not in society's best

21   interest.

22          So I find at the present time that the

23   defendant has not rebutted the presumption.

24   Therefore, I find by clear and convincing evidence

25   that there is no condition or combination of

1    conditions which would reasonably assure me that if

2    released he would not pose a danger to the community,

3    and I find by a preponderance of the evidence that

4    there is no condition or combination of conditions

5    which would reasonably assure me that if released he

6    would not pose a risk of flight.

7            But I will -- Mr. Bagley, I note you have

8    been at a procedural disadvantage.  You appeared in

9    this case only just over a week ago, and I know that

10   you've received the materials which are the subject of

11   the proffer.  You have had an opportunity to review

12   them.  I don't know how much time you've had, but I

13   will say my ruling right now is detention.

14           I'll give you the opportunity based on

15   changed circumstances including further review of what

16   you've seen um to apply to reopen the hearing, but at

17   this time, that's going to be my ruling.  Um, now,

18   let's talk about a scheduling order on the indictment.

19   How much time, Nick, for voluntary discovery.

20           MR. COOPER:  Judge, voluntary discovery in

21   this matter based on the conduct that's charged in the

22   indictment is largely complete based on what I've

23   provided so far, but I'd ask the Court for 30 days to

24   allow the Government to obtain any additional material

25   that's discoverable under Rule 16 and provide it.

```
 1              THE COURT:  Okay.  So today is September 14.
 2     So why don't we say October 14 is a Saturday.  How
 3     about October 16, Monday?
 4              MR. COOPER:  That works for the Government.
 5     Thank you, Your Honor.
 6              THE COURT:  Okay.  Jeff, how much time for
 7     defense motions?
 8              MR. BAGLEY:  Judge, just briefly on that
 9     matter because I know Mr. Cooper takes a very literal
10     view of the discovery obligations that he has, Judge.
11     So there is an indictment now.  I do make a formal
12     demand for discovery, and we are entitled to it now
13     with that demand, Judge, so it's not technically
14     voluntary anymore, Judge.  So just that clarification
15     but --
16              THE COURT:  Well, okay.
17              MR. BAGLEY:  -- um, I'll take, Judge, I
18     think -- I think, Judge, if what I have in terms of
19     discovery is essentially um -- essentially complete,
20     then, Judge, I think just maybe 30 days from the 16th.
21              THE COURT:  Okay.  So that would be
22     Wednesday, November 15.  And um --
23              MR. BAGLEY:  That is the week that, Judge,
24     I'm on trial.  Maybe we could push it to the following
25     week, Judge.
```

1            THE COURT:  Okay.  How about Wednesday,

2    November 22?

3            MR. BAGLEY:  Thank you.

4            THE COURT:  Okay.  Um, how much time for the

5    Government's response?

6            MR. COOPER:  Just if -- two weeks is

7    acceptable to the Government if that's acceptable to

8    the Court.

9            THE COURT:  Okay.  That would be December 6.

10   Um, Eric, do you want to give us a date and time for

11   oral argument?

12           THE CLERK:  Yes, Judge.  Thursday, December

13   14 at 2 p.m.

14           THE COURT:  Is that acceptable to counsel?

15           MR. BAGLEY:  Yes, thank you.

16           MR. COOPER:  It's acceptable to the

17   Government.  Thank you, Judge.

18           THE COURT:  Okay.  Mr. Cooper, do you wish

19   to be heard as to the speedy trial act between, what

20   did we say, November 22 -- or today and November 22?

21           MR. COOPER:  Yes, Judge.  Thank you.  Judge,

22   the Government is asking that the time between today's

23   date, that's September 14, 2023 and November 22, 2023,

24   be excluded from the speedy trial act pursuant to

25   Title 18 United States Code Section 3161(h)(7)(a) and

54

1     3161(h)(7)(b)(4).

2            During the time between today and November

3     22, 2023, the Government is going to um compile and

4     provide any outstanding discoverable material to Mr.

5     Bagley.  During that timeframe, I expect that Mr.

6     Bagley is going to review that discovery and discuss

7     it with his client.  Um, he'll also need that time to

8     prepare motions which he's requested a schedule to

9     file, and so it's in the best interest of the

10    defendant that this time be excluded to allow him to

11    obtain discovery, review discovery and file motions,

12    and those interests outweigh the interest of the

13    public and the defendant in a speedier trial.  And so

14    for those reasons, we'd ask that the time be excluded.

15           MR. BAGLEY:  No objection, Judge.

16           THE COURT:  I'll adopt counsel's

17    representations as my findings concerning an exclusion

18    of time between today and November 22, 2023, from the

19    speedy trial act calendar.  For the reasons stated by

20    counsel, I find that the ends of justice served by the

21    granting of the continuance outweigh the best interest

22    of the public and the defendant in a speedy trial.  70

23    days will remain on the calendar as of November 22,

24    and if motions are filed, then time will be further

25    excluded by operation of law.

1          One final matter just so the record is

2   clear.  I'm going to return to Mr. Cooper the

3   photographs that were handed up to me, so I'm not

4   making them part of the record right now.

5          MR. COOPER:  That's fine, Judge.

6          THE COURT:  Um, but I don't -- particularly

7   given that one is a -- of a sensitive nature, um, I --

8   I'm not going to retain it.  It will -- the Government

9   will retain it.

10          MR. COOPER:  I acknowledge receipt, Judge.

11   Thank you.

12          THE COURT:  Okay.  Thank you all.  Defendant

13   is remanded.

14          (Proceeding concluded at 12:31 p.m.)

15

16          **CERTIFICATE OF COURT REPORTER**

17

18          I certify that this is a true and accurate

19   record of proceedings in the United States District

20   Court for the Western District of New York before the

21   Honorable Jeremiah J. McCarthy on September 14, 2023.

22

23   S/ Brandi A. Wilkins

24   Brandi A. Wilkins

25   Official Court Reporter